CHANCERY. Ford *vs* Stewart, &c. and Pollock's Administrator *vs* Ford, &c.

*Case* 60.                ERROR TO THE LOUISVILLE CHANCERY COURT.

*Principal and Agents. Surety.*

*Sept.* 14.         JUDGE BRECK delivered the opinion of the Court.

Case stated.      In October, 1839, Taylor, as the administrator of Pollock, held a note upon N. W. & J. C. Ford for $2150 47,

which had been due since the March preceding. J. C. Ford was the surety of N. W. Ford upon said note.

With a view to raise the money for the payment of this note, and to obtain further time, N. W. Ford proposed drawing a bill at sixty days, upon the house of E. Ford & Co. of New Orleans. Taylor refused to give further time without the consent of J. C. Ford, and refused to consent to any arrangement in reference to the bill proposed, if it were in any way to affect the liability of the Fords, or either of them, upon the note. To obviate the objections of Taylor, N. W. Ford procured his bill to be indorsed by J. C. Ford, and a memorandum at the same time was signed by both the Fords as follows:

"I have this day indorsed a draft, drawn by Nicholas W. Ford, which is passed to Dabney Taylor, the object of which is, with the proceeds of the draft at maturity, to pay a note which said Taylor, as the administrator of William Pollock, holds against the said N. W. Ford, and to which I am security, dated, April 21, 1837, and payable on the 20th March, 1839, for $2150 47; and it is distinctly agreed, that the said draft shall in no wise affect our liability on said note; and if paid at maturity, the proceeds are to be applied to its payment, including all interest which may be due, and any exchange which may be paid in converting the proceeds into par funds at Louisville, Kentucky. The said draft is drawn upon Edward Ford & Co. of New Orleans at sixty days, and dated 1st October, 1839, and is for the sum of $2260.

N. W. FORD,

*October* 16, 1839.                    J. C. FORD."

The draft was drawn, payable to N. W. Ford's own order. On the same day of the date of the foregoing memorandum, N. W. Ford and Taylor called on Willis Stewart, a Commission Merchant in Louisville, and made an arrangement with him to forward the draft to New Orleans for collection, and pay over the proceeds, when received by him, to Taylor, in discharge of his note upon the Fords. They left with Stewart the draft, memorandum aforesaid, and the note, and also a memorandum signed by N. W. Ford and Taylor as follows:

"We leave with you N. W. Ford's draft on E. Ford & Co. New Orleans, for $2260, sixty days from the 1st instant, which forward for payment, and when paid, have the proceeds returned to Kentucky in best form you can for the interest of the drawee, and when the funds are received, please pay over to Dabney Taylor the amount of a note of N. W. Ford & J. C. Ford to William Pollock for $2150 47, and interest since due to time of payment. This note is also left with you, and when payment is made to Mr. Taylor, retain the note receipted, for N. W. Ford.                    . N. W. Ford,
                                        Wm. D. S. Taylor."

*October* 16, 1839."

The object of the bill of N. W. Ford.

Stewart forwarded the draft to Shannon & Brothers, New Orleans, for collection, with directions to remit the proceeds in checks upon Philadelphia or New York. The bill was paid but the funds not remitted.

The house of Shannon & Brothers failed in the spring 1840, and in April, 1840, N. W. Ford exhibited his bill in chancery against Stewart, Taylor, J. C. Ford and Myerle, Stewart & Bland, a house with which Stewart was connected. Ford charges in his bill, that the house of Shannon & Brothers, to whom Stewart had sent the bill, was not, at the time, a house of good standing and credit; that Stewart and the firm of Myerle, Stewart & Bland were each indebted to Shannon & Brothers when his draft was paid, in a sum exceeding the amount thereof, and that Shannon & Brothers had passed the proceeds of said draft to the credit of Stewart or to the credit of said firm, and that the conduct of Stewart had, throughout, in relation to the transaction, been grossly negligent and fraudulent ; that Stewart had refused to deliver up to him his note to Pollock or Taylor, and prays that the Chancellor would compel a surrender thereof, and that it might be cancelled.

Stewart's answer to N. W. Ford's bill.

Stewart, in his answer, denies all the allegations of fraud and negligence. He denies that he acted as the agent of complainant and Taylor to collect the draft and apply the proceeds; that he accepted no trust as charged, but merely agreed, at the special instance and request of complainant and Taylor, without fee or charge, to for-

ward the draft to his agents, Shannon & Brothers, for collection, and if collected and the proceeds received by him, to apply them as requested. He denies having received any portion of the proceeds of said draft, and also denies any indebtedness by him or by the firm of Myerle, Stewart & Bland, to Shannon & Brothers, when the draft was paid or since.

Taylor, in his answer, denies that he had any interest in the transaction, and insists that it was for the sole benefit and accommodation of N. W. & J. C. Ford. He makes his answer a cross bill against them, and prays a decree for the amount of his note. J. C. Ford answers, denying that he was, in any way, connected with the arrangement between N. W. Ford and Taylor and Stewart; insists it was made without his knowledge or consent; that he was unwilling to indorse the draft of N. W. Ford, without an assurance that the proceeds were to be applied in discharge of the note upon which he was security to Taylor; and as this draft was paid, submits to the consideration of the Court, whether he is not discharged from further liability upon said note.

Taylor's answer to N. W. Ford's bill made a cross bill vs N W. & J. C. Ford, and the prayer thereof, and the answers of J. C. Ford.

The Chancellor decreed that Stewart should pay to N. W. Ford and Taylor, the whole amount of the draft of said Ford upon Edward Ford & Co. with interest from the time it was paid.

The decree of the Chancellor on the original bill.

That upon the cross bill of Taylor against the Fords, Taylor was entitled to receive of N. W. Ford the amount of the note of said Ford and J. C. Ford, to William Pollock, with interest, and so decreed.

—And upon Taylor's cross bill.

That upon the original bill of N. W. Ford, and upon the cross bill of Taylor, as to J. C. Ford, it was decreed that he be discharged and released from all liability upon the note upon which he was surety for N. W. Ford to Pollock. Of this decree Stewart and Taylor both complain, and by several writs of error, have brought the case before this Court for its revision.

The decree as against Stewart will be first considered.

The decree of the Chancellor is preceded by a very interesting and learned opinion, in which, so far as relates to the legal positions assumed by him, we very generally concur. We are, however, constrained to differ with him

FORD
*vs*
STEWART, &c.

A delay of an agent of only three days in forwarding a bill to the place of payment, (and that delay the result of sickness,) was not such gross negligence as to render the agent responsible, especially as the bill was paid wthin three days of the time of payment. Nor would the fact that the firm to which the bill was forwarded, failed immediately thereafter, render the agent liable as for gross neglect, provided its credit was good at the time, and more especially as the principal knew that the bill was to be forwarded to that house for collection.

somewhat in the analysis of the facts of the case, and as to the effect and weight of the testimony.

We concur in the legal position, that if Stewart, in the execution of the trust or commission in sending, for N. W. Ford and Taylor, the draft in question to New Orleans for collection, and in view of receiving the proceeds thereof, to be paid over to Taylor, was guilty of gross negligence or bad faith, he should be held responsible for the loss and damage thereby sustained. But we are not satisfied that he stands, by the record, thus convicted.

The first item in the charges against him is, that he did not start the bill from Louisville in time for it to reach New Orleans at maturity. It appears that it matured on the third and reached New Orleans in time to be paid on the 6th December. The cause of the delay in starting it is, we think, satisfactorily explained. It resulted from Stewart's indisposition, and the bill being mislaid. But as the draft reached its destination and was paid on the 6th of December instead of the 3d, no injury resulted, and the delay furnishes no just cause of complaint.

2d. That he sent the draft to a tottering and irresponsible house or agent. In answer to this charge, it is replied, that Shannon & Brothers had been his agent and the agent of the firm with which he was connected, for years, and was then his agent and the agent of said firm.

Besides, it appears that the reputation of the house was then good, and the house somewhat noted for its promptness and dispatch in the transaction of business, and so continued till a very few days before it failed. But this charge is conclusively answered and disposed of by the fact, as we think, satisfactorily established by the testimony, that when Stewart received the draft he told N. W. Ford and Taylor that he would forward it to Shannon & Brothers for collection.

3d. It is urged that he was guilty of negligence in not advising Shannon & Brothers that he was not the owner of the bill, but the mere Trustee. It appears that the bill was forwarded precisely as it was delivered to Stewart, indorsed by N. W. Ford and J. C. Ford, in blank. It is apparent from the proof and from the memorandum

of N. W. Ford and Taylor, that it was contemplated by them that the business should be transacted in Stewart's name and the funds remitted to him in his name, otherwise *it would* have been impracticable for him to pay them over to Taylor. It was no part of the request or of the instructions of Ford and Taylor, that he should advise Shannon & Brothers to whom the bill belonged or how the funds were to be appropriated when they reached Louisville. Besides, who was, at the time, the actual proprietor of the bill, was a question of some doubt. He directed the proceeds of the draft, if paid, to be remitted to him, and the mode, to which no objection is made. It is true, he might have stated in his letter covering the draft, that it did not belong to him, and therefore, that there must be no failure in forwarding the proceeds without delay. Such a suggestion would very clearly have implied distrust as to the promptness and integrity of the house or person to whom it was made, and to a merchant of correct sensibility as to his character, would have been offensive.

It does not appear that Stewart had any reason to apprehend or believe that Shannon & Brothers would be more prompt in remitting the funds, if advised that they belonged to Ford or Ford and Taylor, than upon the supposition that they belonged to him. Shannon & Brothers had no pretext for withholding the fund. Stewart denies that he was indebted to them, either on his own account or on account of the firm of Myerle, Stewart & Bland, and the fact of such indebtedness is not, in our opinion, established by the testimony; nor does it appear that the Shannons ever claimed or pretended that their failure to remit the money resulted from that cause. In view of the charge under consideration, therefore, we are not satisfied that it was the duty or at all incumbent upon Stewart to have apprised the Shannons that he was not the owner of the draft; and we are, consequently, of the opinion that the omission to do it did not amount to negligence or bad faith.

But 4th. Much reliance is placed upon two letters purporting to have been written by Stewart to N. W. Ford, one under date of the 24th December, 1839, and the other

FORD
*vs*
STEWART, &c.
of the 5th January, 1840, as containing evidence of false-hood and deceit. The first purports to be in answer to a letter from N. W. Ford, at Paris, and states in substance, that he, Stewart, had received a letter from his agent in New Orleans; that the draft, for some cause, did not reach there in time, but was presented on Saturday evening and would be paid the next Monday, and as soon as paid the proceeds would be sent to him, and when received would be applied as directed.

The other letter of the 5th January, states that he had received no further information from New Orleans; that the river was closed and no mails, &c.

In reference to the first letter, it is insisted that the draft reached New Orleans after the 3d, and was paid on the 6th, which was Friday, and of course, that no Saturday intervened between the arrival of the draft and its payment. The Clerk states in the record, that these letters are found in the cause, but when filed or by whom it does not appear.

There is no proof in relation to them, nor are they referred to in any way in the pleadings. Upon papers thus appearing in a cause, we should hesitate to base a decree. But regarding them even as exhibits in the case, what do they prove? Do they prove that Stewart did not receive information as therein stated? It does not appear that Stewart had any interest or motive in deceiving Ford upon the subject. The presumption, we think, should rather be indulged, that he was deceived by the Shannons, and we are not of the opinion that these letters furnish sufficient evidence, more especially appearing in the record as they do, of gross negligence or bad faith on the part of Stewart, as charged.

Papers and letters copied into the records of a Chancery cause and not exhibited in the proceedings should not constitute the basis of a decree.—ARGU.

On the 12th January, 1840, Shannon & Brothers write to Stewart, that he "must draw on them at sixty days, for amount of Ford's bill; that they did not collect the amount at the time promised." Stewart, in answer to the allegations in the bill of Ford, that he had refused to draw at a short time, says that he was unwilling to render himself responsible for the money; that he was under no obligation to do so; that he had urged its remittance and continued so to do.

The result of the investigation which we have given to the case, in reference to the liability of Stewart is, that the decree as to him, for the whole amount of the draft of N. W. Ford, and interest, is erroneous: but as it appears that P. Shannon & Brothers had passed, exactly when is not very certain, nor indeed important, the proceeds of said draft to the credit of Stewart, and that upon their failure, the whole amount placed to his credit, upon the schedule of their affairs, was $1542 04, it follows, that but for the credit of the draft, he would have been indebted to them $717 96, and that he has, in effect, therefore, received that much of said draft, and to that extent, with the interest, that said Stewart is responsible to N. W. Ford; and that he is also responsible for what he may have received of the $1552 04, and that as to the residue thereof, that he should transfer the same to said N. W. Ford.

As to so much of the decree as discharges and releases J. C. Ford from the note to Pollock, upon which he was surety for N. W. Ford, and withholds relief from Taylor, upon his cross bill, it remains to be considered.

The Chancellor, in his opinion, shows or refers to no precedent for the discharge of J. C. Ford, and we are not aware of any adjudged case or authority directly applicable to that question. Cases of this kind must rest and be determined, each according to its particular facts and circumstances, upon the general principles of equity, and in that way we are disposed to consider the case before us.

It is obvious that the arrangement for drawing the bill by N. W. Ford upon E. Ford & Co. did not originate with Taylor, but with the Fords—more probably with N. W. Ford. Taylor had nothing to gain by it; he realized no money in hand by it, but delayed thereby the payment of his note. He was to receive no pecuniary consideration for it, nor was he to obtain any additional indemnity or security for the payment of his demand upon the Fords. It is, therefore, not to be presumed that it was contemplated by him or the Fords, that he was to be at any risk, hazard or expense in the business; hence, the memorandum of the Fords was prepared and signed for

A creditor who merely delays suit to await the result of arrangement carried on by his debtor to procure means for payment, without consideration, has thereby done no act to release the surety of his debtor, especially when it is so expressly agreed.

Taylor's security and not for the security of the Fords. Taylor was unwilling to say or do any thing which should affect the liability of the Fords to him upon their note. The assurance upon that point is direct and express. The memorandum says that the *bill is passed to Taylor*, but it would seem that in fact it did not pass to Taylor, and J. C. Ford, in his answer, says it was to be passed to Taylor.

The arrangement could not, in itself, that is, the indorsing of the bill and signing the memorandum by J. C. Ford, have the effect of releasing him from the note—he expressly stipulates that it shall not.

Was any thing done or omitted to be done by Taylor afterwards, which discharges and releases J. C. Ford? We are inclined to the opinion there was not. He made no agreement with N. W. Ford to collect the bill, nor is there any evidence of any undertaking with J. C. Ford except what may be inferred from the memorandum signed by the Fords. The arrangement seems to have been incomplete, to have been *in fieri*, till N. W. Ford and Taylor left the papers with Stewart. But even upon the ground that Taylor had undertaken, with J. C. Ford, to collect the bill, we are not satisfied that he acted with such negligence or bad faith in the matter as to release J. C. Ford from the note.

The presumption is, that the bill was paid with the funds of N. W. Ford, and it was distinctly understood by him, and, we think, throughout, by Taylor and J. C. Ford, that the receipt of the money alone by Taylor was to discharge the note or affect the liability of the parties to it.

We come, therefore, to the conclusion, that so much of the decree herein as discharges J. C. Ford from the note before us is erroneous; and we are further of the opinion, that Taylor, upon his cross bill, is entitled to a decree against the Fords for the amount of said note with interest.

It is, therefore, the opinion of the Court, that the decree herein be reversed and the cause remanded, with directions to render a decree upon the original bill of N. W. Ford against the defendant, Stewart, for $716 96,

with interest from the 6th December, 1839; and as to the residue of the cause, as between said Fords and Stewart, that the Chancellor retain the same with a view to ascertain, by reference to the Master or otherwise, what portion, if any, of the $1542 04 to the credit of Stewart upon the schedule of P. Shannon & Brothers has been received by him, and to that extent he be decreed to pay the same to said N. W. Ford with interest; and as to the residue of said amount, that said Stewart be decreed to transfer the same to said Ford; and to the extent of the decree against Stewart, in favor of N. W. Ford, that the Chancellor retain control over the same, with a view to transfer the same, or apply the proceeds thereof to the benefit of J. C. Ford, should he be made responsible upon the decree to be rendered against him and N. W. Ford in favor of Taylor upon his cross bill.

And it is further the opinion of the Court, that upon the cross bill of Taylor, that a decree be rendered in his favor, as the administrator of Pollock, against said N. W. Ford and J. C. Ford for the amount of their note to said Pollock, with interest.

Decree reversed and cause remanded, &c.

*Guthrie* for Stewart: *Loughborough* for Taylor: *Duncan* for Fords.

PETITION FOR A RE-HEARING ON THE PART OF STEWART,
By Mr. Guthrie.

*Sept.* 26.

THE counsel for Willis Stewart would respectfully suggest to the Court, that the opinion delivered in this case, by which Willis Stewart is charged with the sum of $717 96, as a balance due from him to Pearce Shannon & Brothers, if the proceeds of the draft of N. W. Ford on Edmund Ford & Co. for $2260, had not been carried to his credit on the books of Pearce Shannon & Brothers when paid, or at some after period, will work injustice to the said Stewart, as in point of fact there was not and would not have been, at the time of payment of the draft, or at any after period, any thing due from Willis Stewart to Pearce Shannon & Brothers, on a proper settlement of accounts between them. The attention of the Court is re-

spectfully called to the first and second deposition of Patrick Shannon in the record. In the first deposition he says, that it is his impression that Willis Stewart was indebted to Pearce Shannon & Brothers at the time the $2260 draft was paid and carried to his credit; and in the second deposition he says he was mistaken in the impression which he was under on that point, when the first deposition was taken, and that the mistake arose from charging Willis Stewart with some drafts which ought to have been charged to Myerle, Stewart & Bland. In his first deposition he does not pretend to state the amount which Willis Stewart was indebted to Pearce Shannon & Brothers when the $2260 draft was paid and carried to his credit; and in his second deposition he does not pretend to state what amount of drafts ought to have been charged to Myerle, Stewart & Bland, which was charged to Willis Stewart, and he does not state that the charges in the books of Pearce Shannon & Brothers had been corrected; and it does not appear in the cause that those charges ever were in fact corrected.

Willis Stewart states in his answer, that he had received no account from Pearce Shannon & Brothers after forwarding the draft, and the accounts filed by Stewart were those furnished by Richard H. Chinn, Attorney for the creditors of Pearce Shannon & Brothers, under the insolvent laws of Louisiana; and it is apparrent that he gave the balances as they stood on the books of Pearce Shannon & Brothers at the time the accounts were furnished; and also that these accounts were furnished before either the first or second deposition of Patrick Shannon had been taken, and of course when Willis Stewart stood charged on the books of Pearce Shannon & Brothers with those drafts which ought to have been charged to the account of Myrele, Stewart & Bland.

The counsel would further represent to the Court, that the cause was not prepared with a view of proving the exact state of the accounts between Willis Stewart and Pearce Shannon & Brothers at the time of the payment of the draft, or at any subsequent time. The complainant, when he took the first deposition of Patrick Shannon, was content to prove the balance of the account was

against Willis Stewart without proving the amount of the balance; and Willis Stewart, when he took the second deposition, was content to prove, that he was not indebted on the balance of the account, and that neither party deemed it important to prove the exact condition and amount of the balance, and therefore, that it would be doing a wrong to Stewart to bind him to a balance of $717 96, and give Ford the right to show that he was indebted at that time in a larger sum, or that he had since received the whole or a portion of the balance.

Willis Stewart denied his indebtedness at the payment of the draft or at any subsequent time, and complainant attempted to prove it by Patrick Shannon, and when the two depositions are taken together, Pearce Shannon sustains Stewart's answer, and proves that Stewart was not indebted to Pearce Shannon & Brothers: but the Court say the account furnished by R. H. Chinn which Stewart filed, shows that there was but $1542 04 in favor of Stewart on the books of Pearce Shannon & Brothers, and Pearce Shannon proves the $2260 had been carried to Willis Stewart's credit on those books, and thus it is proved that Willis Stewart was indebted to Pearce Shannon & Brothers in the sum of $717 96, or the whole of the $2260 would have stood to the credit of Stewart on said books. But Pearce Shannon says, in his second deposition, that balance was credited by charging Stewart with drafts which ought to have been charged to Myerle, Stewart & Bland, and if that be so, then there is no evidence to contradict the answer of Stewart, that he was not indebted, and his denial is supported by the testimony of one witness without any evidence in the cause to contradict the answer. The Court will remember that the complainant, Ford, introduced Patrick Shannon as a witness worthy of credit, and the second deposition is but a cross-examination of Patrick Shannon, complainant's own witness, and when thus cross-examined, he sustains Stewart's answer. The Court will find this view of the case sustained by the balance of $2000 43, due Myerle, Stewart & Bland by Pearce Shannon & Brothers as furnished by Richard H. Chinn, Attorney for the creditors of Pearce Shannon & Brothers. But how

would the account stand had those drafts which were charged to Stewart been charged to Myerle, Stewart & Bland, does not appear.

The counsel would respectfully ask a re-hearing on this point of the case, or a modification of the opinion of the Court so as to have the indebtedness by Willis Stewart at the time or at any subsequent time to be inquired into by the Master, and reported upon with the other matters which have been directed to be referred to the Master. The counsel would not have troubled the Court with these suggestions, but that he is assured by his client that he did not owe Pearce Shannon & Brothers any thing, and that, on a review of the record, the counsel is convinced that, as the record stands, there is nothing which ought to charge his client with the sum of $717 96, or any part of it; and the most that the complainant, Ford, could claim, would be a reference when the question will be open to evidence on both sides, which is respectfully submitted.                                   J. GUTHRIE.

PETITION FOR A RE-HEARING ON THE PART OF FORDS,

*October* 30.

By Mr. Duncan.

As the counsel of the Fords, and especially of James C. Ford, I cannot, after reading the opinion, rest satisfied that my duty is fully discharged, without requesting the Court to grant a re-hearing, or at least carefully to re-examine the record and the opinion given.

The opinion says, "the Chancellor shows nor refers to no precedent for the discharge of J. C. Ford, and we are not aware of any adjudged case or authority directly applicable to that question." That cannot be a good objection to the decree of the Chancellor, for he may have considered the precedents for the principles involved familiar, and the reversing opinion must, itself, stand obnoxious to the very objection thus taken to the reversed decree.

By the terms "cases of this kind," the Court is understood to mean, cases for which there can be found neither precedent, adjudged case, nor authority, and not cases of principal and surety; because it is believed that cases

affecting the rights and responsibilities of sureties, are of such great importance, that the rules to govern them should be fixed, stable, and well known, and that the very worst rule that could be made would be that which would submit every case on that subject to the mere arbitrium of the Judge, uncontrolled by precedent. The Court is, moreover, understood to say, that even in cases for which no precedent nor authority can be found, the discretion of the Judge is to be limited and controlled by the general principles of equity. The counsel has searched, with great care, for any great controlling principles of equity which has been violated by the opinion of the Chancellor, and has been unable to find them, after examining this opinion, which, on its face, purports to be a leading case, upon a new and hitherto unexplored subject.

The opinion says, "that it is obvious that the arrangement to draw the bill did not originate with Taylor." Now if that fact is to be all important, then it is respectfully urged that it is equally obvious that it did not originate with James C. Ford.

The opinion says, "that Taylor had nothing to gain by it; he realized no money by it, but delayed thereby the payment of the note." In answer to which, with due respect to this Court, it is believed by the counsel, that it may fairly be said that Taylor, holding a note which was due, not only wished to collect it, but was bound as administrator, to do so, and that he must have demanded. or requested payment, to have imposed on N. W. Ford the necessity of asking for time ; and that Taylor did have something to accomplish, something to gain by the arrangement. If he had sued at law, he would probably have lost more time and been subjected to a longer delay than by taking the bill ; and he would have incurred costs of counsel fees which he could not have recovered back. He had then the strong probability of *gaining in time* and *saving in expense;* and although he gained no money in hand, he got a sixty days bill on New Orleans, proven on the record by its payment, to be a perfectly good bill, and he got an allowance of interest and exchange. Such a bill will ordinarily, and I may say always command money, and in most cases it is a better payment than

money, because the holder can retain it and save interest, till the very day he wishes to use it, with a reasonable certainty of commanding the money when he wants it.

The next proposition is, "that Taylor was to receive no pecuniary consideration for it." He was to receive the legal rate of interest, which it is believed is always regarded by Courts of Law and Equity, as a just and full consideration for the use or forbearance of money. I do not contend, however, that a mere voluntary forbearance, with the understanding that interest was to run, and when the obligor cannot claim a right to delay upon the agreement made, would discharge a surety. The next position is, "nor was he to obtain any additional indemnity or security for the payment of his demand upon the Fords." This, it is respectfully insisted, is a mistake; he got a bill on E. Ford & Co. with an express assurance, which the law would otherwise have implied, that E. Ford & Co. would, upon presentment, accept it. If Taylor had done his duty according to the agreement, the terms of which were reduced to writing, the Court, it is believed, cannot doubt that the acceptance promised would have been given. There was, to say the least, a contingent and highly probable prospect of obtaining additional obligors, with a certain equitable transfer of any funds that the drawer might have in the hands of the drawees.

The Court is not asked *to presume* what was contemplated by a contract, reduced to writing with great care and deliberation. It is asked only to give to the writing the force and effect of its own terms. It is conceded that the writing, No. 2, was drawn for the protection and benefit of Taylor and not for the protection and benefit of J. C. Ford: but then the *indorsement of the bill* was made for Taylor's benefit, and hence J. C. Ford had a right to judge of the terms on which he would make the indorsement. Those terms were adjusted, and there can be no difficulty in ascertaining what they were. Taylor might have avoided all risk and responsibility as to that bill, in two ways, to-wit: by refusing to accept it and to stipulate about it; or if he made any agreement about it, and did receive it, then by complying with the duties devolving

on him by the terms upon which he accepted it, he received it as a collateral, and it was *his duty* to present it. He was not at liberty, after *becoming the holder*, to make an arrangement with any body, by which the proceeds were to be diverted from himself, *without discharging J. C. Ford.* The substance of the assurance given to Taylor was, that the bill, till payment, was to stand in Taylor's hands, as collateral, and that if paid, the proceeds were *to be applied by Taylor* to the payment of the interest and exchange; and the note, if paid upon the terms of the writing No. 2, it was equivalent, in equity, to a payment of the note *to Taylor.*

The Court assume the proposition that the arrangement was "incomplete," "*in fieri*," till the papers were left with Stewart. An agreement was made between Taylor and N. W. Ford, for *the giving of a bill to be indorsed by J. C. Ford*; Taylor gets his attorney to draw up a paper to be signed by J. C. Ford, as a part of that agreement; he is consulted, and agrees to the terms, signs the papers, indorses the bill, and both are delivered to Taylor; what remained to be done to complete that arrangement, is not perceived.

It is contended that Taylor, by the first arrangement, No. 2, made an agreement, not only with James but also with Nicholas, to accept and collect the bill: but it is admitted that afterwards there was a novation by said Nicholas and Taylor, by which Nicholas, *so far as he was concerned*, waived the necessity of Taylor's complying with the duty devolving on Taylor by the original stipulation on that subject to Nicholas Ford.

If it be conceded that Taylor undertook with J. C. Ford, to collect the bill as the condition or consideration on which that bill was indorsed, it is respectfully insisted that no question of neglect or bad faith arises, or can be considered; for if he so undertook, he was bound to comply with his undertaking; and the bill having been actually paid, it would, on that hypothesis, be a payment to Taylor. The payment to *his agent* was a payment *to him.* If he was bound to present and collect and did present and collect, by himself or his agent, there would end all

controversy—such collection *by him* would be equivalent to payment.

The Court says, however, that although the paper says "it is passed to Taylor," that in fact it did not, and the pleadings are referred to to sustain that proposition. Let us advert then to the pleadings: N. W. Ford files his bill to compel Stewart to pay Taylor, and to surrender his note, making Taylor and J. C. Ford defendants. He alledges that when J. C. Ford was applied to for his concurrence, James consented to the arrangement about the bill, "provided *it was to be given to Taylor*, to be applied to the payment of said note, either at the time of the delivery of it, or when the bill should be collected. Said Taylor had a memorandum drawn by his counsel, to be signed by J. C. Ford, and it was accordingly signed by J. C. Ford, *and delivered to said Taylor*." He then alledges, in substance, that he *afterwards* again met Taylor, and they finally went to Stewart and made and signed another memorandum, and left *the bill and the note*, and the said two written memoranda, all of which Stewart is called on to produce and file. Stewart answers and files each memorandum, and both are copied into the opinion delivered. They are brought forward by the process of the Court, from the position in which they were placed by Nicholas Ford and Taylor.

Taylor answers and does not controvert or deny any of those allegations. And, moreover, he says, after speaking of the treaty and the agreement in relation to the bill, "that *in pursuance of this understanding, the paper filed with Stewart, with his answer, No. 2*, was executed," &c.

Taylor cannot escape the conclusions that he took this bill upon some understanding, "*in pursuance of which*" he, when it was fresh in his memory, had the paper, No. 2, drawn by his counsel; and that this paper, after it was executed, *was delivered to him*. There is then no room left for conjecture as to the understanding on which J. C. Ford indorsed that bill.

But again—when Taylor and Nicholas W. Ford made and left *their* written memorandum, and the note and bill with Stewart, this *writing*, No. 2, drawn by Taylor's counsel, was *present*, and was *committed to Stewart's cus-*

*tody.* The bill and note was handed to Stewart, *accompanied by that paper*, which gave Taylor power over the bill, and that *was done by Taylor*, for the writing then made begins, "we leave with you," &c. and ends, "Wm. D. S. Taylor, N. W. Ford." Taylor must, upon legal principles, be estopped to deny that he accepted the bill, after he has, with a paper giving him control over it, assumed a right to control it, and in fact controlled it.

The opinion propounds the interrogatory, "was any thing done or omitted to be done by Taylor afterwards which discharged or released J. C. Ford?" My answer to that inquiry is, that he afterwards made an agreement with Stewart and N. W. Ford, without the privity or assent of J. C. Ford, whereby he tied his hands, and that this new agreement was highly prejudicial to James C. Ford, and, therefore, that James C. Ford was discharged.

When we poise ourselves on those great general principles of equity which the opinion concedes must govern and control the discretion of the Judge "in such cases," no proposition is plainer or sounder, or has a deeper foundation in natural justice than this, that any agreement, made by a creditor with his principal debtor, without the assent of, and which is *prejudicial to* the surety, should discharge that surety. If A, and B, as his surety, give a note to C for $1000, and A, as a collateral security, mortgages estate of the value of the debt to C, and C release that security without B's consent, I take it that B is discharged, because B, by paying the debt, would have been entitled, in equity, to be substituted to all of C's rights under the mortgage.

And if, instead of mortgaging estate, A had delivered to C notes and bonds of the value of the debt as collateral, and C, without the consent of B, assigned them away, or returned them to A, or collected them, I take it that C is discharged in equity.

How is the case at bar distinguishable from that? Here A draws his bill, indorsed by B in blank, and it is delivered to C. It can be passed by *delivery* as effectually as *by indorsement*; and by a combination between A and C, it is diverted from its position as a security for the debt without B's consent. Here is a *novation* by Taylor

without James C. Ford's consent, which has greatly prejudiced his rights. Without this novation Taylor would have continued to hold the bill himself, and must have collected its amount, and when collected by him, the collection would, in equity, have been equal to a payment of the note. He *had power over the bill* by the memorandum which was left with Stewart, and certainly did part with it to James C. Ford's prejudice and without his approbation.

The opinion says, the presumption is, that the bill was paid by the funds of N. W. Ford. J. C. Ford required the stipulation, that if he indorsed the bill Taylor, must take it. He denies that he asked time, that he requested the arrangement. He says he knew that a bill on his factors, indorsed by him, would certainly meet due honor, and that he was not willing to incur the hazard of providing for the bill and of being, by the fraud or im. providence of unknown agents, left bound also to provide for the note. N. W. Ford was *good* or *good for nothing*. If *good*, then Taylor, when he made the novation at Stewarts was confiding in him and Stewart. If *good for nothing*, then he probably did not provide the means to pay the bill. All I ask is, that he shall not, for one purpose, be considered good, and then for another purpose in the same argument, be considered good for nothing.

The opinion says, that James C. Ford's answer says the bill "was to be passed to Taylor." With due deference I think that is a mistake. The Court has confounded *the allegation of the bill*, as to what J. C. Ford said, when first consulted on the subject and before the paper was drawn, with J. C. Ford's answer. James C. Ford's answer says, "the paper of the 16th October, 1839, signed by N. W. Ford and J. C. Ford, was signed and delivered for the purposes therein expressed and none other ;" and in his answer to the original bill he says, "he was called on to indorse the bill and consented to do so on the terms set forth in the paper which said Taylor procured to be drawn and sent to him for his signature, and which he signed, and sent to said Taylor." He says he was not privy to the arrangement made with Stewart, and did not know of it till the bill was paid,

and that he did not solicit time and did not ask any indulgence. This, however, is deemed immaterial after Taylor, *with that paper*, left the bill in the hands of Stewart.

The counsel, however, thinks that the principles which should govern this cause are well settled by precedents and adjudged cases. They may be found in the case of *Norton* vs *Roberts, &c.* (4 *Monroe*, 491–7.) The numerous cases therein cited, establish the doctrine, that to discharge a security it is not necessary that a new agreement *should be taken in satisfaction,* or that there should be any new consideration. That it is not necessary that the new engagement, without the assent of the surety, should be such as to bar an action at law. That a holder of a bond or bill may and can do what he pleases, but he acts at his peril, "for if he alter the situation of any other party *to the prejudice of that person,* he cannot afterwards proceed against him." "He must not let slip any lien"—"he must not increase the risk." It would be an idle parade of authority to cite the very numerous cases settling the principle last noticed. The last case on the subject, perhaps, is *Kenningham* vs *Bedford, &c.* (1 *B. Monroe,* 325,) establishes the proposition, that an *executed agreement* between the creditor and the principal, without the assent of the surety, discharges the surety, but it does not reverse *Norton* vs *Roberts.*

This Court has decided over and again, that where, by the act of the creditor, the *surety cannot proceed against the principal,* the surety is discharged, and, therefore, whenever the principal has bound his hands so that he cannot proceed or so that the surety could not proceed in equity against the principal, the surety is discharged. In the case of *Norton & Roberts,* it is laid down that it is not necessary for the new agreement to be sufficient to bar an action at law. What, I ask, was the condition of Taylor when he, upon a contract with the principal, *parted with the note upon the agreement made with N. W. Ford and Stewart?* Would it not have been against the scope and spirit of that agreement for him to have proceeded upon the note? He tied his hands by the deposit

of the note, and J. C. Ford then could not have attached N. W. Ford's property in equity.

It is not pretended that J. C. Ford was a party to that contract. J. C. Ford could not be construed as assenting to that contract with Stewart. Taylor had dominion over the bill, by his contract with J. C. Ford, and acted at his peril. He, to J. C. Ford's prejudice, violated the terms, consideration and condition on which J. C. Ford indorsed the bill and *gave him dominion over it.* I therefore contend, that adjudged cases do settle the principles on which this case should turn, and that it is not one to be adjudged by the feelings of the Court or a reference to any hardship that may be supposed to result from an application of settled principles to the facts of the particular case.

I now come to the other branch of the case, in which James C. Ford has a great interest, if he is bound to pay the note to Taylor notwithstanding the payment of that bill.

The bill, the note, and the memoranda, were left with Stewart on the 16th October; the bill was payable 3d December. It was withheld till the 24th November, and then forwarded to the Shannons, without stating that it did not belong to him. Stewart is proven to have been indisposed, but "not so much as to preclude his attention to business:" (see J. Sturgeon's deposition.) The bill was paid on the 6th of December. Shannon says, in substance, that the bill was passed to Stewart's credit, and "he thinks W. Stewart was notified of the fact;" and he says, that in some instances P. Shannon & Brothers accepted, *as courtesy acceptors,* bills drawn by Stewart to raise money for his firm; and that in some cases Stewart accepted kite bills for the Shannons; and that *"there were open credits;"* and that the New Orleans house was pushed for funds in 1839; and that he believed W. Stewart was indebted to the Shannons when that collection was made; and he states another important fact not referred to in the opinion, "that after the 6th December, 1839, *there were other bills on P. Shannon & Brothers which W. Stewart, or his firm, had drawn, and which matured after said date."* In a subsequent deposition, taken at the instance of Stewart, it is true that he

says he believes he was mistaken as to the fact that W. Stewart individually was indebted when the collection was made; that some Banks refused to take the name of one of Stewart's partners, and that therefore Stewart drew in his individual name for the use of his firm; and that although the books of P. Shannon & Brothers showed a balance against Stewart on the day the collection was made, that balance was created by charging him with some of his bills which he had drawn for his firm, and not for himself; and from first to last no account current between the two houses can be got. The plaintiff calls expressly and emphatically in his bill for the letters and accounts between these two houses, and charges that they, if produced, will exhibit the fraud and neglect of Stewart. Upon such facts the Chancellor thought there was neglect sufficient to bind Stewart, and this Court disagrees with him. Knowing how different minds view the same facts, I would not, under ordinary circumstances, have considered it worth the effort to ask a re-hearing when the Court was so clear on a mere question of fact, as to reverse a cause upon it alone. But it appears that no letters of Stewart to Ford were read at the hearing which were not indorsed by the Clerk at the time they were filed. They appear to have been read without objection below; and this Court, in regard to them says, "there is no proof in relation to them, nor are they referred to in the pleadings. Upon papers thus appearing in a cause we should hesitate to base a decree;" and after commenting on their effect as evidence, the Court recurs to the subject in these words, "more especially appearing in the record as they do;" thereby showing that the influence operating on the mind of the Court was not so much the evidence as this circumstance upon which the Court was dwelling. It is conceded that Clerks ought to indorse papers filed: but suppose they are not indorsed although filed, whose fault is it, that of the Clerk or the party?

The bill alledged that "Stewart equivocated with and about, and concealed from said Taylor and your orator the facts in relation to his said trust," and "that Stewart was in due time notified of the payment," &c. Suppose

that before or even at the hearing, *two of his letters* were offered, and objected to for want of proof, a Court of Equity might have given time to have the hand writing proven, if the letters were material to the justice of the case—then the defendant would have gained nothing by the objection. The record shows no objection to them; and this record has higher evidence that they were read than the Clerk's indorsement; this Court has the indorsement of the Judge; and it is respectfully insisted, that after the commentary of the Chancellor on those letters, (which is made part hereof, marked O,) there can be no question left upon the subject of their having been filed and read. To deny or refuse assent *to the fact that those letters were read at the hearing*, it is respectfully contended, is to subvert that confidence and regard which is due, at all times, to the records and proceeding of the Courts of all enlightened countries. If the Judge decides a case, heard and submitted, and in his opinion, made part of the record, comments at great length upon a deposition or a deed, or a letter, can it be that an appellate tribunal would listen, for a moment, to an objection that the deposition, deed or letter was not read, especially when it appears, that during the residue of the term no application was made to the Court on the subject? Will this Court reverse the presumption that what is done in Court is done rightfully, (4 *Monroe*, 82,) and assume, without any thing whereon to base the assumption, that the Court has decided upon matters not in the cause? I trust not; and I trust that upon mature consideration, this Court will recede from the position, that any doubt can be raised *in this Court*, upon the fact whether the letters were read, after such an emphatic indorsement of them as they have in the Chancellor's opinion, spread on this record. The fact that they were read as evidence, being conclusively established, and there being no objection to them, I had supposed that it was settled by an unbroken series of decisions, not to be lightly overthrown, that no exception to them as evidence, can be raised or allowed in the Appellate Court. On this point at least, we are not at sea without rudder or compass; we have "precedent, adjudged cases and authority" directly in point: (*Hardin,*

184; 1 *Bibb,* 526; 2 *Marshall,* 66.) From the stress laid upon this position, (the error of which it is believed will be seen,) there is reason to apprehend that the decision has been too much influenced.

From the amount of important business before the Court when this case was disposed of, the counsel can well account for the error into which the Court, as he humbly conceives, has hastily fallen: but he has no apprehension that any pride of opinion will operate on this Court, to make it consecrate error, if, upon examination, any error shall be found to exist. I take it then, that those letters were read, without objection, in the inferior Court, and that they are evidence in this cause, *that Stewart wrote those letters to Nicholas W. Ford;* they are clearly competent and applicable to the issue.

As to the effect of them, conceding that such letters were written, I claim that they, in connection with the other evidence, do show that the opinion of the Chancellor ought not to have been reversed.

A re-hearing is most respectfully asked.

GARNETT DUNCAN.

REPLICATION ON THE PART OF TAYLOR,

By Messrs. Loughborough & Field.                *October* 30.

THE counsel for Taylor will not discuss the question, whether a case in equity may not be decided without a precedent in point. The facts presented may be novel, their combination peculiar, and yet the Court urged, as in this case, by a party who insists that he is discharged from a debt, will consult the principles of equity, and determine from them whether the claim should be sustained.

The Judge of the inferior Court had decided J. C. Ford's discharge. That there is no precedent sustaining his decree, is, upon its revision in this Court, a consideration of some importance; and though the want of an authority may not show the decree to be wrong, yet the deficiency makes it the duty of the revising Court to consult the principles applicable to the case, and guided by them, to decide it. In this it cannot be said that there is any

FORD
vs
STEWART, &c.

privilege of an arbitrary discretion, so long as it shall remain true, that by the constitution of the human mind, the conclusions of the judgment are wholly independent of the dictates of the will.

The petition arrays alledged advantages to Taylor by the arrangement, in respect to, the bill. What are they? The two Fords are firmly bound, by a direct. obligation, now due: can they be more strongly bound by a bill for the amount, with their names upon it? Is Taylor more secure by the bill then by the note? The petition supposes a suit upon the note, and the delays of a collection by law. But why is the presumption of a suit upon the note to be indulged? The law does not declare it, and throughout the petition J. C. Ford is treated as a man of large means, who would not wish to incur the cost of a hopeless defence ; and surely the *verbal* statement of either or both of the Fords, that the bill would be honored, cannot, in the eye of the law, be a gain to Taylor. It was valueless.

But the petitioner says, Taylor obtained the legal rate of interest by the bill. Had he not that by the note? It was due, and by nature, bore interest. Taylor had interest in any event.

An allowance for exchange is spoken of. The debt to Taylor was payable in Kentucky. All that he sought was payment here, with interest, and upon the whole arrangement, that was all he was to get. Had he received more he might have been compelled to refund it.

Is it a mistake to say that a bill with the names of the two Fords only upon it, was not any further or better security for the debt than the note of the same parties? And is the hope, or even the express assurance of those parties, that a distant stranger would accept the bill, in any legal or even practical view of the matter, an additional security to Taylor? As little it seems, in reality, as what is called "an equitable transfer" of funds, of the existance even of which, in the hands of the drawee, Taylor had no certain knowledge.

Upon the merits of the case, the argument of the petition rests upon the proposition of a fact, not to be found in the record. It asserts that the bill was delivered to Ta y

lor; and upon this, with the allegations of a contract between Taylor and the Fords, in respect to the bill, complete so far as J. C. Ford was concerned, the complaint is, that Taylor, by the arrangement with Stewart, made a novation to the prejudice of J. C. Ford.

A thorough scrutiny of the record will fail to discover any proof that Taylor ever was the holder of the bill; on the contrary, the inference, from what is said by the Fords themselves, seems irresistible, that the bill passed from J. C. Ford, by the hands of N. W. Ford, to Stewart.

The allegations of the bill of N. W. Ford cannot properly be taken as evidence against Taylor. That bill was filed against Stewart, and as to him, Taylor's interest was with the complainant. Taylor was not particularly assailed in the bill nor put upon his defence. The prayer of the bill was for relief against Stewart. It would be a surprise upon Taylor, now to hold that his not answering the statements of the complainant against Stewart, was an admission of their statement, in all their consequences, as against him. But it is not alledged by N. W. Ford, that the bill of exchange was delivered to Taylor; nor does J. C. Ford say, in either of his answers, that the bill was ever delivered to Taylor. In his answer to N. W. Ford's bill, he merely says he indorsed the bill on the terms in the paper of October 16, 1839; and he does not even say that this paper was delivered to Taylor. He states that he sent it to him; that is, most probably, N. W. Ford brought him the paper which he signed, and then indorsed the bill, and handed both to his brother, who was the negotiator in the whole affair, as plainly appears; and the signing was done at the house of N. W. Ford. In his answers to the cross bill, J. C. Ford says, the paper of October 16, was signed and delivered (by whom? To whom?) for the purposes therein expressed.

This is the extent of the allegations of the Fords as to the delivery and custody of the bill. If it had been, in fact, passed to and received by Taylor, upon his undertaking to collect it, would it not have been positively and certainly charged? It does not appear that Taylor and J. C. Ford ever had an interview upon the subject of the

debt. If, when J. C. Ford indorsed the bill, he handed it to Taylor, is it to be doubted that it would have been plainly so stated?

When the bill is next observed, we find it passing into the hands of Stewart. From whom did it so pass? If Taylor had held it, he would probably have indorsed it. The correct view of the transaction is, that N. W. Ford, holding his own bill, on which he had obtained his brother's indorsement, leaves it with Stewart for collection, and instructs him, when the money is collected, to pay Taylor the amount of his note; Taylor, on his part, leaves the note with Stewart, and by express direction of the parties, the note is not to be delivered to Ford until Taylor, in person, (for his receipt is to be given,) has received the principal and such interest as may have accrued at the time of payment. Is not this whole arrangement inconsistent with the fact, (which the parties have not ventured to alledge,) that Taylor was the holder of the bill?

Of what consequence is it that the direction to Stewart begins, "we leave with you," &c. and ends with the names of Taylor and Ford? If joint in its language, it is several in its meaning and effect.

It does not clearly appear, that Taylor ever had possession of the paper of the 16th October; and however this may be, is the recital in the paper that the bill is passed to Taylor to be of any avail if the fact be that he never had it? Upon what principle shall he be estopped by an untrue recital in a paper signed by the Fords? Shall J. C. Ford escape by the fact, that Taylor's counsel drew the paper in the expectation that the bill would be delivered to Taylor, when Ford does not prove or even alledge that when he indorsed the bill he handed it to Taylor, or that N. W. Ford, who procured his indorsement, did so.

Had Taylor received the bill to collect, directly or indirectly, from J. C. Ford, there would have been some ground for the position that the subsequent transaction with Stewart was a "novation" which discharged him.

J. C. Ford gave the bill, with his blank indorsement, to his brother. If he does not pass it to Taylor as pro-

vided in the memorandum of the 16th October, but puts it in the hands of another person for collection, can the indorser say that the transaction was completed, so far as he is concerned, by indorsing the bill? J. C. Ford, the indorser, hands the bill, not to Taylor, who was to be the indorsee, but to the drawers. Something is yet to be done. The bill is where it started. The drawer, instead of giving the bill to the indorsee, placed it in the hands of an agent for collection. If it be said he did this with the assent of Taylor, (who is passive, and says only when he gets the money he will give up the note,) did he not do it, also, with the consent of J. C. Ford, who committed the bill indorsed in blank to him? Shall not the authority of J. C. Ford for what was done afterwards be a proper and legal implication? If N. W. Ford had sold to a stranger the bill indorsed by his brother in blank, would not the indorsee have been bound to the purchaser? Thus, the transaction with Stewart was the completion of that which had started as a plan for paying off the claim of Taylor ; a plan too, which, in the beginning, the Fords united in assuring Taylor "should, in no wise affect" their liability on the note which he held.

The principles of equity mentioned in the petition, regulating the discharge of sureties in consequence of the transfer by the creditor of collaterals, deposited with him by the principal debtor, do not apply to this case. Here the creditor never had the bill which was intended for a collateral.

The case of *Norton* vs *Roberts*, decides nothing applicable to this ; nor do the general conclusions deduced by the petitioner from that and the other "very numerous" cases adverted to, influence the legal consideration of the peculiar facts of this case. Here the first act is an assurance by the surety, that what is proposed to be done shall not affect his liability—in effect a declaration, that as to that matter he will be a principal debtor.

But if the doctrines stated by the petitioner, as to the discharge of a surety where the creditor has received no new consideration, or where his hands are not tied, were applicable to this case, the recent cases of *Brinegar* vs *Phillips*, (1 B. Monroe, 283,) and *Tudor* vs *Goodloe*,

(1 *B. Monroe*, 322,) might be referred to, to show them erroneous in the extent to which they are advanced.

Of what moment, as to the liability of J. C. Ford, is the inquiry, whether Taylor had not lost the right of proceeding against N. W. Ford until the maturity of the bill; and whether J. C. Ford could have attached his principal's property if he has expressly stipulated that the making, and even the taking of the bill by Taylor should not, in any way, affect his liability? And of what avail, in application to the facts of this case, are decisions founded only on the *relation* of a surety, when he has made no such agreement?

The cases may have established that the bad faith of the creditor, or *his* mismanagement of collaterals, may discharge a surety who became such on the faith of those collaterals; here the surety is already bound for the debt. He says he will remain so bound until, upon a bill which the principal now makes, the creditor shall get his money. That bill the creditor never gets; and though paid, the money never is received by him. J. C. Ford is a surety for the debt, not merely a guarrantor of the bill. To entitle him to a discharge, it is obviously incumbent on him to show that Taylor got the money, or that he got the bill and the money was lost by *his* fault or neglect, or that of *his* agent. Taylor was not trusted with the note and the bill at the same time, nor was it intended he should be. Stewart was certainly the agent of N. W. Ford, and (by the relation of the parties) of J. C. Ford for the collection of the bill. Ford's original bill, in this case, is founded upon that agency.

The bill was to be paid, and was paid, with the money of N. W. Ford, and J. C. Ford has lost nothing but the chance that his principal's money would be applied in paying the principal's debt—a chance too not in his contemplation when he became the surety.

LOUGHBOROUGH & FIELD.

RESPONSE,

By Judge Breck.                                                          *October 31.*

THE petition for re-hearing, by the counsel of Stewart, has been duly considered, but without producing any change in the opinion of the Court.

. We are entirely satisfied that the proceeds of Ford's bill were placed, by the Shannons, to the credit of Stewart. Such is the testimony of P. C. Shannon, and there is nothing in the record showing that any other disposition was made of them. Stewart denies, in his answer, that he was owing the Shannons any thing when the bill was paid, but he does not show the state of his accounts with them when he filed his answer; nor does he deny that, independent of the proceeds of the bill, he was then indebted to them. He exhibits with his answer, the communication from Josephs or Chinn, showing "that the amount of $1542 04, was placed to his credit upon the schedule of their (the Shannons,) affairs;" he does not controvert that this was the true amount. It is true he says he had frequently applied for a statement of his accounts, but without success. It should be recollected that Stewart was, himself, a merchant, and ought and must be presumed to know the exact state of his accounts with the house of Shannon & Brothers.

We are still, therefore, of opinion that Stewart, in effect, received the benefit of $717 96, of the proceeds of Ford's bill, and to that extent should be held answerable. What interest Stewart had in the house of Myerle, Stewart & Bland, and how accounts stood between that house and the house of Shannon & Brothers, we have not deemed it necessary to inquire.

The petition for re-hearing is overruled.

The Court has, also, attentively examined and considered the petition of the counsel for the defendants, the Fords. It is deemed unnecessary to go into a re-argument of the facts; so far as it relates to the controversy between J. C. Ford and Taylor, the replication of the

counsel of the latter, goes very fully into the facts and merits of that branch of the case, and renders unnecessary any additional response.

We would merely remark, that although the answer of J. C. Ford may not expressly state that the bill *was* to be passed to Taylor, yet we think it clearly authorizes such an inference.

So much of the petition as relates to the controversy between N. W. Ford and Stewart, and as refers to the *letters* from Stewart to Ford, and upon which great reliance seems to have been placed, will be briefly noticed. That these letters were genuine, or in other words, written by Stewart, it was certainly not our intention, in the opinion rendered, nor is it now, to question. That they were before the Chancellor when he wrote his learned opinion, we surely could not doubt; for although not indorsed by the Clerk, except by certifying that they ''appear in the cause without indorsement or by whom filed,'' yet, as remarked in the petition, they are most emphatically indorsed by the Chancellor. But as they were not made exhibits, and in no way referred to in the pleadings; not proved—not filed by consent of parties—nothing indicating when or by whom filed, or that the attention of Stewart or his counsel had, in any way, been directed to them, this Court was of opinion, and still is, that they were not, under such circumstances, entitled to the same weight and consideration as if they had been made exhibits, or had appeared so to have come into the cause as obviously to direct attention to them, or as they would have been, had an abortive effort been made to explain their seeming inconsistency.

But even if it appeared that they had been regularly filed, and were free from every thing in any manner tending to impair their force and weight, we are still of opinion they do not furnish sufficient evidence to convict Stewart of fraud. Stewart denies, in his answer, that he received any intimation of the payment of *the bill* till the 12th January, 1840; ''he denies that he equivocated with, about or concealed from complainant the facts in relation to said bill.'' If at the date of the letters, he

had received information of the payment of the bill, then these statements in his answer are false.

Now Stewart was, at the time, a merchant of high character for truth and integrity, and upon this point the testimony, certainly, as to N. W. Ford, is conclusive. He was selected by him as his agent in this business, for the very reason that he was trustworthy. Can it then be presumed, that a man of such character, and without any conceivable motive, should have written to Ford these letters, fraught with falsehood and fraud, as they are said to be, unless based upon the information, as to the bill, which he had received from New Orleans? We think it far more probable, and it is certainly more charitable to suppose, that Stewart was deceived by the Shannons, whose conduct in the transaction, proves them faithless. Such a reasonable supposition at once relieves Stewart, before that time esteemed by the complainant as a man of integrity and honor, from the imputation of falsehood, fraud and perjury, for of all this he must be guilty, if he wrote these letters, with the knowledge that their contents were false.

Upon this branch of the subject, we are entirely satisfied with the opinion rendered, and the petition is, therefore, overruled.